FILED
Clerk
District Court

**IN THE UNITED STATES DISTRICT COURT** NOV 20 2012
**FOR THE NORTHERN MARIANA ISLANDS**

for the Northern Mariana Islands
By_____
(Deputy Clerk)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No.: 1:12-CR-00017 |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) **MEMORANDUM OPINION AND ORDER** |
| vs. | ) **DENYING IN PART AND GRANTING IN** |
| | ) **PART DEFENDANT'S MOTION TO** |
| THOMAS WEINDL, | ) **SUPPRESS AND DENYING** |
| | ) **DEFENDANT'S MOTION TO DISMISS** |
| Defendant. | ) |
| | ) |
| | ) |

## I.     INTRODUCTION

Before the Court is Defendant Thomas Weindl's motion to suppress evidence and, in the event the suppression motion is granted, to dismiss the indictment with prejudice.[1]

Weindl is charged with two counts of receiving child pornography and two counts of accessing child pornography with intent to view it.   The charged conduct is alleged to have occurred on or about June 15 and June 18, 2012.   Weindl seeks to suppress (1) information regarding possible child pornography Internet searches and downloads obtained from a laptop computer without a warrant, and (2) statements he made to law enforcement agents on June 28, 2012.

The suppression motion turns on the intersection of the personal and professional lives of two individuals: Thomas Weindl, the former principal of Whispering Palms School in Saipan, Commonwealth of the Northern Mariana Islands ("CNMI"); and Joseph Auther, a special agent of the Federal Bureau of Investigation ("FBI") who had children enrolled in

---

[1] Initially, on October 4, 2012, Defendant moved only to suppress evidence (*see* ECF No. 29).  Later the same day, he filed an Errata in which he additionally moved to dismiss the indictment (*see* ECF No. 30).

Whispering Palms.  Auther monitored his eldest son's computer activity by installing spyware on a laptop purchased by the Public School System ("PSS") and issued to the boy for school-related use.  The spyware sent Auther e-mails listing his son's website visits and keystrokes.  When his family was preparing to leave Saipan, Auther returned the laptop to Weindl at the school but did not remove the spyware.  A few days later, he received e-mails indicating that someone was using the laptop to visit websites involving child pornography.  The ensuing investigation led to Weindl's questioning and arrest.

In response to the motion, the Government filed an opposition brief (ECF No. 34), to which Weindl replied (ECF No. 39).  In his reply, Weindl raised a new argument, that Auther's conduct violated federal wiretap laws and should be suppressed on statutory grounds.  The Government did not object to the Court's considering this argument, on the condition that it have adequate time to respond in writing.  Subsequently, the Government filed a memorandum on the wiretap issue (ECF No. 44), to which Weindl responded (ECF No. 46).

The matter came on for an evidentiary hearing on October 25, 2012.  Over four days, the Court heard testimony on behalf of the Government from Auther as well as FBI Special Agent Edmund Ewing and Tim Thornburgh, the federal programs officer at PSS.  The defense presented testimony from Clarence "Bud" White, the owner of a computer service business in Saipan.  Weindl himself submitted two sworn declarations (ECF Nos. 29-2 and 38) but did not testify.

Having reviewed all the testimony, declarations, and exhibits, and having heard argument of counsel for both parties, the Court now DENIES the motion to suppress with respect to the eBlaster e-mails and reports as well as the statements Weindl made during the June 28 interview in his office at the school.  The Court GRANTS the motion to suppress with

respect to statements made in response to police questioning after Weindl was formally taken into custody outside his office and without adequate advisement of his constitutional rights. Because substantial evidence remains available to the Government in its case in chief, the motion to dismiss is DENIED. The reasons for these determinations are explained herein.

## II.    BACKGROUND

The Court finds the following facts based on the testimony, declarations, and exhibits introduced into evidence at the motion hearing.

### A.    Search of the Laptop Computer

Joseph Auther is an FBI special agent. He is married and has three school-age sons. His eldest son, a seventh grader at Whispering Palms School in Saipan, had been issued a laptop computer obtained by PSS through a federal grant. In July 2011, Auther installed on the laptop a commercial software product, eBlaster, for the purpose of monitoring his son's Internet use. The company that produces eBlaster is SpectorSoft. Auther had heard about eBlaster from a friend, a retired FBI agent who had installed it on his own child's computer. Auther had never used eBlaster in FBI investigations.

On his home computer, Auther visited the SpectorSoft website and purchased eBlaster with his personal credit card. After he had installed the program on the laptop, eBlaster sent messages to Auther's personal e-mail account several times a day. The e-mails contained reports listing any websites and chat rooms that had been visited and the keystrokes that had been entered on the laptop. Auther accessed his e-mail through Microsoft Outlook. The inbox listing would show that a message had been received from eBlaster and would give the subject as "Report," followed by the date and time span of covered activity. (*See* Ex. 2.)

3

A sister court has provided a succinct explanation of how eBlaster works.  It accords with descriptions of the software given in testimony at the hearing on this motion, so the Court adopts it:

> eBlaster is a computer software program that can perform various spyware functions. It can record every keystroke made on the computer on which it is installed.  It can also keep track of all websites visited and all applications used on that computer, and it can capture screenshots of instant messages and cached webpages.  In addition, it can be directed to compile a report of this information at selected time intervals and send that report to a designated third party email address. Further, it can be directed to automatically forward copies of incoming email accessed on that computer to the third party email address. Each individual email is sent separately and independently from the eBlaster reports. eBlaster can also forward to this third-party email address copies of instant messages or "chat" messages as they are occurring.

*Klumb v. Goan,* 2012 U.S. Dist. LEXIS 100836, *6 (E.D. Tenn. July 19, 2012).

Auther did not tell his son that he had installed eBlaster.  No icon or other sign appeared on the laptop's user interface to indicate that eBlaster was installed.[2]

In October 2011, Auther was having technical difficulties with eBlaster and called SpectorSoft's customer support line.  In the course of fixing the problems, the technician walked Auther through the steps to uninstall and reinstall the program.  (*See* Ex. C, record of SpectorSoft service call.)

In April 2012, Auther learned he was being relocated to the FBI's Denver office.  By June 15, in preparation for the move, all Auther's CNMI cases had been transferred to other agents, and Auther was not conducting any ongoing investigations or looking to open new ones.

---

[2] "Even with an anti-virus program, eBlaster generally cannot be detected on the computer on which it is installed unless a person knows the 'hot key' combination, the three key combination which must be depressed simultaneously in order to make eBlaster's dialog box appear on the computer screen. Once the dialog box appears on the screen, a username and password is required in order to go to the eBlaster control panel. At the control panel, the user chooses the settings for eBlaster to provide the desired information." *Klumb* at *6.  Auther testified that he knew to press a key combination in order to install an update or to change settings for the frequency of activity reports.

4

On or about June 6, Auther notified Thomas Weindl, the principal and corporate director of Whispering Palms, that he would have the laptop serviced and have all his son's files, programs, and games wiped from the hard drive before returning it to the school. He did not tell Weindl that he had installed eBlaster.

Auther had known Weindl for about five years. They saw each other almost daily during the school year and went on the annual school camping trip together. Auther frequently stopped by Weindl's office. Although he and Weindl did not socialize, Auther considered Weindl a friend. When Weindl got married in January 2012, Auther's wife gave a reading at the ceremony.

The first step Auther took to service the laptop was to bring it into the FBI office and ask fellow agents for advice on how to wipe it clean. They tried to remove all the files but were unsuccessful. Next, on June 8, Auther asked a local computer store to repair a scratched screen and wipe off all the files on the laptop's hard drive. The store's service order (Ex. 1) lists the work to be done as "Reimage" and the work performed as "Clean out files." Auther did not tell the technician about eBlaster, but he expected that the cleaning would eliminate the program. That evening, he gave the laptop to Weindl at Whispering Palms and told him something to the effect that it had been wiped clean and the files had been deleted. He did not mention the eBlaster spyware to Weindl.

For the next week, Auther received no e-mails generated by eBlaster. Then, in the late afternoon of Friday, June 15, Auther noticed that he had received a series of eBlaster e-mails.[3] He clicked on the subject lines and read the reports. The reports alluded to Internet searches for

---

[3] Four e-mails with "sent" dates on or before June 15 were introduced into evidence: (1) sent June 14, 2012, at 12:29 p.m.; (2) sent June 15, 2012, at 8:00 a.m.; (3) sent June 15, 2012, at 11:00 a.m.; and (4) sent June 15, 2012, at 2:58 p.m. (*See* Ex. 2.)

child pornography.   Auther's initial reaction was shock that his son was visiting sexually explicit websites.  Only on reflection did he realize that he had already returned the laptop to the school.  He wondered if the sudden activity was the result of a computer virus that had infected his home desktop, which he had used to purchase eBlaster, or if another student had accessed the laptop at Whispering Palms.  He did not ask his son if he had taken the laptop back from the school and was using it again.

Auther also wondered if Weindl himself was using the laptop to access child pornography.  Some of the websites appeared to involve young Asian girls having sex with older men.  Auther was aware that in January, Weindl had married a Korean woman, and he now had an 11-year-old Korean stepdaughter.

Early in the evening of June 15, Auther called his wife to get Weindl's cell phone number, and then called Weindl.  Auther pretended to be interested in purchasing the laptop and asked Weindl who he had given it to.  Weindl told Auther he had returned the laptop to PSS.  Auther did not tell Weindl that eBlaster was installed or that he had received reports of child pornography searches on the laptop.  Auther testified that he did not want to raise concerns in Weindl's mind about who was using the computer or about a possible investigation involving Whispering Palms teachers and students.  Weindl told Auther he would not be able to buy the laptop from PSS because it was federally funded.  Auther found Weindl's explanation credible. He did not mention the incident to his colleagues at the FBI or to other law enforcement officials.  However, he was concerned that the Internet activity might mean that a child molester was operating at Whispering Palms.  He was aware that a former coach at Pennsylvania State University had just been convicted on child molestation charges, and he was determined not to allow similar conduct to go undetected at Whispering Palms.

The following Monday, June 18, Auther went to the PSS office around ten in the morning and spoke with Joseph Torres, PSS's technology coordinator.   Auther identified himself to Torres as an FBI agent.  Auther testified that he showed his FBI credentials because he figured Torres would not speak about the laptop matter with just any parent.  Ewing testified that an FBI agent is only supposed to use FBI credentials in relation to the agent's job.

Auther told Torres that he was looking into a student laptop that had purportedly been turned into PSS, and that he was concerned with inappropriate activity on the laptop.  Torres informed Auther that the schools never returned the laptops to PSS but simply redistributed them within each school to new students.  The only school to have returned laptops was Calvary Christian Academy, which had recently closed down.

Tim Thornburgh is the federal programs director at PSS responsible for the laptop program.  He testified that the laptops are purchased for students in grades 7–12 with money from federal grants.  The laptops are provided to both public and private school students.  PSS developed a manual (*see* Ex. 6) to educate parents and students on the use of the laptops for homework and self-directed learning.  Parents and students sign a contract when they receive the laptops. The laptops are the property of PSS.  If the student takes good care of the laptop, it is gifted to the student upon graduation.  During the student's school career, the laptop remains the property of PSS.  Thornburgh met monthly with public and private school principals to discuss the laptop program and the agreement.

After leaving PSS, Auther visited his Internet service provider in hopes of obtaining information about an Internet Protocol ("IP") address that appeared in the eBlaster reports. The support staff refused to disclose the information.  Auther was able to determine from them, however, that the eBlaster activity was not coming from his home.  Auther testified that he may

have shown his FBI credentials to the support staff.  He conceded that to ask for information about someone else's IP address would have crossed the line into an official investigation.

Around noon, Auther spoke with his wife.  In his testimony, he was unsure whether he talked to her on the phone or stopped by their house.  He learned that they had received a new eBlaster report on Internet activity involving child pornography.[4]  It is not clear from the record whether he or his wife opened the report or how much information they gleaned from it.

That afternoon, shortly after two o'clock, before going to the FBI office, Auther drove by Whispering Palms.  He noticed that Weindl's car was parked at the school.  He did not stop in, but called Weindl on the cell phone.  Auther reiterated his desire to find the laptop and mentioned his concern that there may be some inappropriate content on it.  Weindl responded that he had done some checking of his own; that some "hanky panky" was going on at PSS; that he had determined that the laptop had been recirculated; and that he had spoken to some PSS officials and was looking into the matter on his own.  Auther did not confront Weindl with the fact he had visited the PSS offices and knew that Weindl had lied about returning the laptop there.

The telephone conversation strengthened Auther's suspicions of Weindl.  When he got to the FBI office, he reported about the illicit Internet activity and Weindl's possible involvement to Special Agent Ewing.  He also notified the CNMI Attorney General about his concerns and asked that someone from child protective services check on Weindl's stepdaughter.

---

[4] Two e-mails sent June 18, 2012, were introduced into evidence: (1) sent at 11:57 a.m., and (2) sent at 2:57 p.m. The first of these e-mails reports activity from "Fri 03:10pm to Mon 12:09pm." (*See* Ex. 2a.)  The second one reports activity from "Mon 12:09pm to 03:09pm." (*See* Ex. 2.)  Both reports involved child pornography.  It is not clear how a report purportedly sent at 2:57 p.m. could report activity that supposedly occurred 12 minutes later. The discrepancy is not relevant, however, to the disposition of this motion.

After June 18, Auther stopped receiving e-mail reports of Internet activity from eBlaster. On June 22, he forwarded the eBlaster e-mails to Special Agent Ewing. Ewing interviewed Auther and took steps to open a formal investigation, including contacting his supervisor and a federal prosecutor.

## B.   FBI Questioning of Weindl

On the morning of June 28, 2012, Auther and Ewing came to Weindl's office at Whispering Palms. They drove there in an unmarked FBI vehicle and were in civilian clothes devoid of any FBI insignia. They carried concealed handguns. They had obtained a search warrant for Weindl's office and the school but hoped to talk with Weindl before serving it. They had not made an appointment with Weindl or been invited to visit him.

When the agents arrived at the school about 10:45 a.m., Auther opened the door of Weindl's office and saw that Weindl was in a meeting with a school parent. Ewing and Auther waited outside at picnic tables for about five minutes while Weindl and the parent talked in Weindl's office. Ewing testified that at this point, Weindl was the sole suspect of the investigation, but that the FBI did not have probable cause to arrest him prior to interviewing him.

When Weindl and the parent came out of the office, the four men engaged in small talk for a few minutes. (Ewing happened to know the parent from activities unconnected with the school.) After the parent left, the agents told Weindl they wished to speak about the missing laptop. When a maintenance crew started making noise with power tools, they moved into Weindl's office. From the record, it is not clear whether Weindl invited them in or one of the agents suggested they go in. Ewing and Auther closed the door behind them. Weindl had no access to the door without walking past the agents.

Weindl's office was a small room, about six feet wide and twelve feet long. It had one window, which overlooked a picnic area. The room had only two chairs: one behind the desk and one for visitors. When the three men came in, Auther offered to stand, but Weindl went into a classroom and brought a third chair for him. Weindl sat at his desk. Ewing sat at a small table facing Weindl. Auther sat behind Ewing, directly in front of the closed door, as the room was too narrow for the two agents to sit side by side. Auther described the room as "cramped." Weindl said he felt "cornered." (First Decl., ECF 29-2, ¶ 15.)

Weindl's office had two doors. The outer door was the entryway from the picnic area, and the inner door led to a classroom. Auther was between Weindl and both doors. The outer door remained closed throughout the interview.

Ewing led the interview. He told Weindl that they were investigating the disappearance of the PSS laptop because it had been obtained with federal funding. He said that if Weindl did not cooperate and provide specific and accurate information, a larger investigation would have to be undertaken, which would involve questioning school staff and parents. In response, Weindl apologized for not having told the truth from the beginning, when Auther first called him on June 15. He said he was embarrassed that the laptop had gone missing from his office and so had lied about the disappearance. Ewing asked Weindl when the laptop had disappeared, and Weindl was unable to give a specific date. Ewing then told Weindl that inappropriate Internet activity had been observed on the laptop, and that it was important to understand who had been using it. He repeated that they would have to start interviewing members of the community if Weindl was not more forthcoming. Weindl then admitted that he had viewed pornography on the laptop for about three days before destroying the unit and throwing the pieces in the jungle.

The entire interview lasted between 45 minutes and one hour.  It was not recorded.  The agents testified that throughout the interview Ewing's demeanor was calm and his tone was conversational, and Ewing never raised his voice.  Ewing testified that he made no threats or promises.  However, he acknowledged that he exploited Weindl's fear of a wider public investigation to encourage Weindl to speak honestly, and that he assured Weindl he would share information that Weindl provided only with other FBI agents and federal prosecutors.

Weindl perceived Ewing's questioning to be "quite threatening and frightening in nature."  (First Decl. ¶ 19.)  He felt "trapped" and without a choice but to respond or be immediately arrested.  (*Id.* ¶ 20.)  He did not feel free to refuse to answer questions or to end the interview.  (*Id.* ¶ 21.)

At no point before or during the interview did Ewing or Auther advise Weindl of his constitutional rights or tell him that he was free to leave.  Weindl never asked to take a break or leave the room.  He never asked the agents to stop questioning him and never requested an attorney.  At one point, when Weindl had become more forthcoming about his activities on the laptop and seemed embarrassed, Auther asked him if he wanted him (Auther) to leave the room. Auther thought that given their friendship, Weindl might be more comfortable talking to Ewing alone.  Weindl declined the offer.

After the interview, the three men walked out of the office.  Auther and Weindl waited at the picnic tables while Ewing went to his car.  Ewing called a federal prosecutor on the telephone and the decision was made to arrest Weindl.

Ewing gave Weindl an advice of rights form (Ex. 3), which Weindl read and signed. Weindl maintains that he was told to sign the form and did not read it carefully because he was upset.  (First Decl. ¶ 22.)  Other FBI agents were now also present.  Ewing testified that because

they were in public, and out of concern for Weindl's privacy, he did not read the rights form to Weindl aloud but gave it to him to read silently.

Before signing the form, Weindl agreed, both orally and in writing (Ex. 4), to allow the agents to search his residence and any computers at the residence. After signing the form, Weindl described the location where he had disposed of the laptop. He agreed to get in the agent's car and go look for it. Weindl was patted down and put in the back seat of an FBI vehicle, where he sat alongside another agent. Weindl was not handcuffed. Ewing drove. Weindl directed Ewing to an area at the top of Navy Hill. Ewing spent about 20 minutes searching but did not locate any pieces of the laptop. Weindl was then taken to the U.S. Marshals Office and booked into custody.

## III. DISCUSSION

### A. Suppression of eBlaster Reports

The Fourth Amendment of the United States Constitution protects persons against unreasonable searches and seizures of their home, property, papers, and effects. A search occurs in cases involving common-law trespass or "when government officers violate a person's 'reasonable expectation of privacy.'" *United States v. Jones,* 132 S.Ct. 945, 949–50 (U.S. 2012) (quoting *Katz v. United States,* 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). Thus, for a person to invoke the protections of the Fourth Amendment, a search must be the product of government action, and the aggrieved person must have a reasonable expectation that the information seized would remain private—commonly referred to as Fourth Amendment standing.

//

1        1.    Whether the Seizures Were the Product of State Action

2        The Government asserts that because Auther was not acting in his capacity as an FBI

3    special agent when he installed eBlaster on his son's laptop, the seizure of evidence against

4    Weindl was not the product of a government search.  (Opp'n at 7.)  Searches and seizures

5    "effected by a private individual not acting as an agent of the Government or with the

6    participation or knowledge of any governmental official" are not constrained by the Fourth

7    Amendment.  *United States v. Jacobsen,* 466 U.S. 109, 113 (1984) (quoting *Walter v. United*

8    *States,* 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)).  In cases where the seizure was

9    made by a private person, the burden is on the defendant to establish government involvement.

10   *See United States v. Snowadzki,* 723 F.2d 1427, 1429 (9th Cir. 1984).  There must be "some

11   degree of governmental knowledge and acquiescence" in a private person's actions to bring the

12   search under Fourth Amendment scrutiny.  *United States v. Sherwin,* 539 F.2d 1, 6 (9th Cir.

13   1976).  In close cases involving something more than a complete absence of governmental

14   participation but less than overt state action, the court must examine the facts and circumstances

15   to determine "(1) whether the government knew of and acquiesced in the intrusive conduct; and

16   (2) whether the party performing the search intended to assist law enforcement efforts or further

17   his own ends."  *United States v. Reed,* 15 F.3d 928, 931 (9th Cir. 1994) (quoting *United States*

18   *v. Miller,* 668 F.2d 652, 657 (9th Cir. 1982)).

19       Typically, in cases where the existence of state action is at issue, the person who

20   conducted the search was a private citizen, not employed by law enforcement, who shortly

21   before or after the search had reported a suspicion of criminal activity to police.  That is so in all

22   the cases cited in the Government's Opposition: *see United States v. Cleaveland,* 38 F.3d 1092

23   (9th Cir. 1994) (utility company employee reported anonymous tip about power diversion to

police); *Miller* (private citizen relayed tip on stolen trailer to police); *Reed* (room search by hotel manager); *Sherwin* (search of cartons by truck terminal manager); *United States v. Shetty,* 171 Fed. Appx. 561 (9th Cir. 2006) (business documents obtained by private parties and turned over to law enforcement agents); *Snowadzki* (search of co-worker's papers by employee of private company); *Walther,* 652 F.2d 788 (9th Cir. 1981) (search of overnight case by airline employee).

When the actor is an off-duty law enforcement officer, however, the initial inquiry must be whether he was acting "under color of state law." *See United States v. McGreevy,* 652 F.2d 849, 851 (9th Cir. 1981) (search of package by city police officer moonlighting as private security consultant); *Traver v. Meshriy,* 627 F.2d 934 (9th Cir. 1980) (detention of bank customer by off-duty police officer employed as teller). If a government officer "does not act within his scope of employment or under color of state law, then that government officer acts as a private citizen." *Van Ort v. Estate of Stanewich,* 92 F.3d 831, 835 (9th Cir. 1996).

Auther's actions were under color of state law if they were "in some way related 'to the performance of his official duties'" or "pursuant to [a] government or police goal." *Id.* at 838 (quoting *Martinez v. Colon,* 54 F.3d 980 (1st Cir. 1995)). Auther's installation of eBlaster on the laptap in June 2011 was unrelated to the performance of his duties as an FBI special agent. His intent was solely to monitor his son's Internet activities. He had no reason to believe that anyone other than his son, to whom Whispering Palms had issued the PSS laptop, would use the computer during the period when it was loaned out to the boy. Auther was acting as a devoted father, not a law enforcement officer.

The circumstances changed, however, when Auther returned the laptop to Whispering Palms. If Auther had intentionally left eBlaster on the laptop in order to track the activities of

the next user, knowing that he would be duty-bound to report any observed criminal conduct, his continued receipt of eBlaster reports might be in pursuit of a police goal and therefore constitute a Fourth Amendment search.  But the evidence suggests that Auther left eBlaster on the laptop inadvertently.  When he gave the laptop to a service technician for reimaging, he did not mention the eBlaster software, let alone direct the technician not to disturb eBlaster.   It appears that Auther did not care whether eBlaster remained on the laptop or not.  The fact that Auther was preparing to relocate his family to the mainland makes it all the less likely that he was privately, without direction from his superiors, launching a sting to uncover misuse of federally funded school computers on Saipan.  In all likelihood, he had other things on his mind.

Weindl maintains that even if Auther did not mean to leave eBlaster on the laptop, his act of opening the eBlaster e-mails converted an inadvertent search into an intentional one. (Reply at 7.)  He points out that the subject lines showed that the reports covered a period of time (June 9–14) after Auther's son no longer had possession of the laptop.  The conclusion he draws is that Auther "did not have a justifiable basis (private interest or otherwise)" for viewing the contents of the report. (*Id.*)

This argument is not persuasive.  The search was the gathering of information by eBlaster, not the viewing of the contents.  The analysis would be no different if Auther had turned the reports over to other law enforcement officers without having read them.  However intentional the act of opening the e-mails may have been, the searches were still, at this juncture, inadvertent.  The Court therefore finds that the initial data received from eBlaster and viewed by Auther on Friday, June 15, 2012, prior to Auther's contacting Weindl, are not the product of a search conducted under color of state law.

//

Neither would the initial eBlaster reports come under the Fourth Amendment via the two-part test for private-party searches. Even if Auther "acquiesced in the intrusive conduct" when he failed to direct the service technician to remove eBlaster, the intrusive conduct – the installation of eBlaster – was not by the government, but by Auther the private citizen. As for the second prong of the test, there is no evidence that Auther intended to further a law enforcement purpose by keeping eBlaster on the laptop. Therefore, Defendant Weindl has failed to carry his burden to show that he should be accorded Fourth Amendment protection from the private-party eBlaster search.

The same cannot be said for the eBlaster reports that were generated after Auther called Weindl on the evening of June 15. By that time, Auther knew that someone may have been viewing illicit material on the laptop. He suspected Weindl even before he called him. When he did call, he hid his real concern about the laptop's usage behind a pretense that he was interested in purchasing the computer. After the call, he did not uninstall or disable eBlaster, even though as a private citizen he was under no obligation to continue monitoring an unknown person's offensive Internet activities. He did not immediately call his colleagues at the FBI and hand the investigation over to them – conduct that might have indicated Auther wanted to maintain a separation between his private self and his public persona as a law enforcement officer. After Weindl told Auther that he already delivered the laptop to PSS, Auther continued his investigation into the child pornography website searches. Auther testified that in his mind, he was still concerned that the searches may point to his son. He was also concerned that someone within PSS may be using the laptop for these illegal searches. At the PSS offices, he showed his FBI badge. At the Internet service provider, he relied on the fact that he was known to be an FBI agent to seek information about IP addresses. The totality of the circumstances

shows that at this point, Auther's actions were related to his official duties and in pursuit of a police goal. Although a formal FBI investigation had not been opened yet, Auther was now acting under color of law. Therefore, the searches that generated eBlaster reports after the initial phone call to Weindl are subject to Fourth Amendment scrutiny.

The government asserts that even if Auther's conduct constituted state action, his discovery of the illicit Internet activity through eBlaster e-mails was accidental and therefore does not come under the Fourth Amendment. In support of this theory, the Government relies on *Thompson v. United States*, 382 F.2d 390 (9th Cir. 1967). In *Thompson*, two police officers and a private security guard questioned Thompson in his hotel room about suspicious cashing of travelers checks. *Id.* at 391–92. During the questioning, the security guard straightened a picture on the wall and a small packet fell out from behind the frame. *Id.* One of the police officers opened the packet and found marijuana. *Id.* The police then arrested Thompson on narcotics charges, searched the hotel room incident to the arrest, and seized a cache of stolen travelers checks. *Id.* Thompson moved to suppress all evidence as the product of an illegal search and seizure. *Id.* at 392. The trial judge denied the motion. *Id.* at 393. A divided panel of the Ninth Circuit affirmed, finding that the marijuana was "accidentally exposed" and that the police were not required to "close their eyes" to it. *Id.*

The government's argument is not persuasive. The holding in *Thompson* is an extension of the plain-view doctrine. Police may seize incriminating evidence in plain view which they come across inadvertently when they have a "prior justification" for the intrusion. *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971). That is to say, the police must be "lawfully present" on the premises. *See Kyllo v. United States*, 533 U.S. 27, 38 (2001); *United States v. Alfonso*, 759 F.2d 728, 743 (9th Cir. 1985). In *Thompson*, police were lawfully present in

Thompson's hotel room because Thompson had invited them in.  *Thompson,* 382 F.2d at 393. The officers did not snoop around while they were there.  Auther, by contrast, had no legitimate justification to intrude on anyone's conduct on the school laptop once it was no longer on loan to his son.  Moreover, the incriminating evidence did not drop out while he was straightening the icons on the computer's desktop but came into view because of intentional spying on the keyboard and hard drive.

Weindl argues that Auther's presence on the laptop through eBlaster was unlawful from the start, because it violated PSS's laptop program agreement as well as the terms of his eBlaster license.  Because the Court finds that Auther was not acting under color of law when he agreed to let his son use the PSS-issued laptop or when he purchased and installed eBlaster, for purposes of this motion, it is irrelevant whether he breached these private contracts.

In summary, Auther's initial receipt and opening of eBlaster reports on Friday, June 15, are not Fourth Amendment searches, but the receipt and opening of eBlaster reports on Monday, June 18, are.

> 2.    Whether Evidence Seized Through eBlaster Searches Must Be Suppressed Under Federal Wiretap Statutes

The federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986 and codified at 18 U.S.C. § 2510 *et seq.*, broadly prohibits interception of wire, oral, and electronic communications except as expressly authorized.  Statutory limitations on the use of intercepted evidence apply "regardless of whether the interception was governmental or private." *Chandler v. United States Army,* 125 F.3d 1296, 1298 (9th Cir. 1997).

The federal wiretap statute allows a private right of action to recover civil damages for unlawful interception of wire, oral, or electronic communication. *See* 18 U.S.C. § 2520; *Klumb*

*v. Goan,* 2012 U.S. Dist. LEXIS 100836 (E.D. Tenn. July 19, 2012).  In criminal prosecutions, however, suppression motions are authorized only with respect to the contents of wire and oral – not electronic – communications.  *See* 18 U.S.C. § 2518(10); *United States v. Reed,* 575 F.3d 900, 915 (9th Cir. 2009).  Clearly, the eBlaster e-mails are not "oral communication uttered by a person . . ."  18 U.S.C. § 2510(2).  The remaining question is whether they are wire communications as defined by statute.

A wire communication is "any aural transfer" involving wire or like connections between the point of origin and point of reception.  18 U.S.C. § 2510(1).  An "aural transfer" is "a transfer containing the human voice" at some point in transmission of the communication. 18 U.S.C. § 2510(18).  There is no evidence that the transmission of information from the school laptop to Auther via eBlaster entailed hearing a human voice.  Therefore, the evidence that Weindl seeks to suppress is not the product of a wire communication.

This result accords with the case law on spyware.  In an early case, the "Milten Spy Function" recorded the requests made of a computer by an intruder as well as the computer's responses to the requests.  *United States v. Seidlitz,* 589 F.2d 152, 154 (4th Cir. 1978).  The information recorded by the spyware was not subject to suppression, because there was "no evidence to suggest that the 'spy' relied in any fashion upon sounds in retrieving information from the computers in written form."  *Id.* at 157.

Weindl cites to no case where the results of spyware searches were suppressed.  All his citations involve civil suits for damages, which the statute authorizes for "electronic

communications." They are not applicable in the criminal context. Therefore, any Wiretap Act violation because of Auther's conduct does not merit suppression of evidence.[5]

### 3.   Whether Weindl Has Fourth Amendment Standing

Although the post–June 15 eBlaster reports are the product of constitutionally protected searches of property, Weindl must show that he has standing to shield himself from them. To have standing to bring a Fourth Amendment claim arising from a search of property, a person must show a subjective expectation of privacy that is objectively reasonable. *United States v. Taketa*, 923 F.2d 665, 670 (9th Cir. 1991). Even if a person has "exhibited an actual (subjective) expectation of privacy" in his activities, he or she lacks Fourth Amendment standing if this expectation is not "one that society is prepared to recognize as 'reasonable.'" *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (quoting *Katz*, 389 U.S. at 361 (Harlan, J., concurring)). A person "aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978) (quoted in *Taketa*, 923 F.2d at 670).

The laptop on which the alleged illicit activity was conducted did not belong to Weindl. It was purchased by PSS with the aid of a federal grant and issued to Auther's son pursuant to PSS's One on One Laptop Computer Policy. (*See* Ex. A.) The laptop, PSS says in its policy booklet, is the property of PSS. (*See id.* at 4 ("Ownership").) In addition, Tim Thornburgh, the

---

[5] Even if the remedy of suppression were available when evidence is gathered through unlawful interception of electronic communications, it is not clear that the eBlaster e-mails would qualify. At least one federal trial court has found that keystroke monitoring by spyware is not "electronic communication" as defined at 18 U.S.C. §2510(12) because it intercepts keystrokes during transmission *within* the computer, from keyboard to central processing unit, not by a system that affects interstate commerce. *United States v. Ropp*, 347 F. Supp. 2d 831, 837 (C.D. Cal. 2004). *Ropp* is a criminal case, but the issue was not presented in a suppression motion. Ropp was charged with attempting to intercept electronic communications, in violation of 18 U.S.C. §2511, by installing a device called KeyKatcher on someone else's computer, and he moved to dismiss on grounds that the alleged conduct did not involve intercepting electronic communications. *Id.* at 831–32.

director of PSS's laptop program, testified that PSS owned the laptop and that PSS laptops were distributed to students only. If the student graduates from high school, the student gets to keep the laptop. If the student does not graduate, then the laptop is returned to the student's school and redistributed to another student. None of the laptops are issued to any teachers or school administrators.

In his Declaration, Weindl tries to establish a property interest in the laptop. He asserts that "[f]or all extents [*sic*] and purposes, the laptops [in the program] belonged to Whispering Palms School[,]" which was "solely responsible for inventorying and issuing the laptops" and was "never required to account for the laptops to either the federal government or PSS." (First Decl. ¶ 7.) Yet even if Whispering Palms had some claim to a property interest, on a theory that the laptops were a gift or had been abandoned by PSS, that claim would not extend to Weindl. Whispering Palms is a not-for-profit corporation (*id.* ¶ 7), not a privately owned business. Corporate assets do not belong to the officers and directors. Weindl, even as president and sole director of Whispering Palms, did not have a property interest in the laptop.

But that is not the end of the inquiry into Weindl's standing to challenge the search. The capacity to bring a Fourth Amendment claim "depends not upon a property right in the invaded place" but on privacy expectations. *Rakas,* 439 U.S. at 143. Weindl asserts he expected his activities on the laptop to be private. He notes that the laptops carried no warning that their use would not be private, and that laptop use was not monitored by Whispering Palms, PSS, or the federal government. (First Decl. ¶ 8.) He declares that this past summer, he operated a "school laptop" in his private, locked office for his sole personal use. (*Id.* ¶ 9.) He states that he viewed his office as his "second home," and considered the office and the computer he used to be private. (*Id.* ¶ 10.) He maintains that when not using the laptop, he

stored it in a desk drawer and never gave anyone "permission to use this laptop or remove it from my office." (*Id.* ¶ 12.)

Sometimes, people delude themselves into thinking that they have a right to things that don't belong to them. That appears to be the case here, with respect to Weindl's use of school laptops. The PSS laptops in the One to One laptop policy are intended for use by students, not administrators and directors. The purpose of the policy is to "provide all students with a laptop computer." (Ex. A at 4.) To receive a laptop, students and a parent or guardian must sign an agreement with PSS. (*Id.*) No evidence indicates that Weindl had a right to use, or himself had permission to use, a PSS laptop, even for school-related activities. Auther turned his son's laptop in to Weindl in Weindl's capacity as an agent for the school, not for Weindl's personal use.

Even if Weindl had a subjective (albeit unrealistic) expectation of privacy in the PSS laptop, it was not an expectation that society is prepared to endorse. An expectation of privacy does not become objectively reasonable just because a person hides someone else's property away in his office desk and does not let anyone else use it. A person cannot have a reasonable expectation of privacy in a computer he stole or obtained by fraud. *See United States v. Wong,* 334 F.3d 831, 839 (9th Cir. 2003) (stolen laptop); *United States v. Caymen,* 404 F.3d 1196, 1201 (9th Cir. 2005) (fraudulently obtained laptop). In *Caymen,* police got a warrant to seize from the defendant a laptop suspected to have been obtained through credit card fraud. *Caymen,* 404 F.3d at 1197. After the seizure, they discovered that the defendant had a prior conviction for possession of child pornography. *Id.* at 1198. They then conducted a warrantless search of the laptop's hard drive, ostensibly looking for evidence of credit card fraud, and instead found sexually explicit images of children. *Id.* The defendant moved to suppress the

images, and the motion was denied on grounds that the defendant lacked Fourth Amendment standing. *Id.* On appeal, the Ninth Circuit affirmed. It found that "one who takes property by theft or fraud cannot reasonably expect to retain possession and exclude others from it once he is caught. Whatever expectation of privacy he might assert is not a legitimate expectation that society is prepared to honor." *Id.* at 1201.

Weindl's case is similar to *Wong* and *Caymen*. Weindl misappropriated school property for his own personal use. Whatever expectation of privacy he developed in the contents of the laptop's hard drive and the keystrokes of Internet searches is not a legitimate one that society is prepared to accept. This is different from the situation where a search is conducted of an employee's designated workplace computer, in which to some degree an employee has a reasonable privacy expectation. *See, e.g., United States v. Ziegler,* 474 F.3d 1184, 1189–90 (9th Cir. 2007). The laptop was not assigned to Weindl and was not his office computer. For these reasons, Weindl lacks standing to claim a Fourth Amendment violation with respect to the eBlaster reports.

### B.    Suppression of Statements

Weindl moves to suppress statements he made to Special Agents Ewing and Auther on June 28, 2012, as the product of custodial interrogation without the benefit of *Miranda* warnings. In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Supreme Court adopted prophylactic measures to protect against coerced, and hence unreliable, confessions. A person in police custody must be advised that he has a right to remain silent and to have counsel present during questioning. *Id.* at 444–45. These protections are "constitutional in nature." *United States v. Craighead,* 539 F.3d 1073, 1082 (9th Cir. 2008) (citing *Dickerson v. United*

*States,* 530 U.S. 428 (2000)).  Any unwarned statements made during custodial interrogation are not admissible at trial.  *Miranda,* 384 U.S. at 476.

The parties do not dispute that Weindl was interrogated in his office and that he was not advised of his rights before or during that questioning.  The only issue is whether Weindl was in custody at the time.

After the office interview, Weindl was formally placed in custody and given an advice of rights form to sign.  The government bears a heavy burden to demonstrate that a person in custody knowingly and intelligently waived his or her right to remain silent and right to counsel before making incriminating statements in response to police questioning.  *See United States v. Rodriguez,* 518 F.3d 1072, 1076 (9th Cir. 2008) (citing *Miranda,* 384 U.S. at 475).  The validity of the waiver depends on whether the totality of the circumstances shows that the defendant was aware of the nature of his rights and the consequences of abandoning them.  *See United States v. Labrada-Bustamante,* 428 F.3d 1252, 1259 (9th Cir. 2005).  If Weindl was did not voluntarily waive his rights, any statements he made in response to FBI questioning while in the agents' vehicle and during the search for the laptop's hard drive would be inadmissible.

1.    Whether Weindl Was in Custody During the Office Interview

A person is in police custody if he has been formally arrested or "otherwise deprived of his freedom of action in any significant way."  *Miranda,* 384 U.S. at 444.  *See also Berkemer v. McCarty,* 468 U.S. 420, 440 (1984) (in custody when freedom of action is curtailed to a degree associated with formal arrest).  Informal custody is determined by examining "the totality of the circumstances surrounding the interrogation."  *Craighead,* 539 F.3d at 1082.  The test is an objective one: whether a "reasonable person in [defendant's] position" would have felt so deprived of his freedom to act "that he would not have felt free to terminate the interrogation."

24

*Id.; see also United States v. Booth,* 669 F.2d 1231 (9th Cir. 1981) (defendant in custody if "reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave."). Hallmarks of custody include "incommunicado interrogation of individuals in a police-dominated atmosphere." *Miranda,* 384 U.S. at 445. Among the factors are "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Beraun-Panez,* 812 F.2d 578, 580 (9th Cir. 1987). When the interrogation is conducted in "locations outside the police station," such as a person's home or office, the proper approach is to consider "the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings . . . into a 'police-dominated atmosphere.'" *Craighead,* 539 F.3d at 1083.

In this case, Weindl was not formally arrested until after the interview in his office at Whispering Palms concluded. The FBI agents did not summon Weindl to speak with them immediately but waited outside his office while he finished a conversation with someone else. When that conversation ended, the agents engaged in social small talk with Weindl and the other person outside. It is not clear whether it was Weindl or one of the agents who suggested they move the interview inside. But it seems most likely that this was a joint decision motivated by a combination of loud noise outdoors from a maintenance crew and the sensitive nature of the agents' questions. Courts have found interrogation to be noncustodial when the defendant "agreed to accompany" officers to a room. *United States v. Bassignani,* 575 F.3d 879, 884 (9th Cir. 2009) (citing *United States v. Crawford,* 372 F.3d 1048, 1059 (9th Cir. 2004); *United States*

*v. Norris,* 428 F.3d 907, 912 (9th Cir. 2005)).   Weindl voluntarily agreed to speak with the agents in his office.

The physical surroundings were not oppressive.   Weindl and Auther had spoken together in Weindl's office many times, about school matters.   Although the office was small and narrow and Auther's seat blocked the door to the outside, the circumstances show that Weindl had some freedom of movement.   At the start of the interview, the agents allowed Weindl to go into a classroom, most likely through the inner door, to retrieve an extra chair.   Moreover, Auther's offer to leave the room so that Weindl and Ewing could talk privately conveyed the agents' willingness to create as comfortable an environment as possible under the circumstances.

The length of the interview, between 45 minutes and one hour, does not tip the scales toward or away from a determination of custody.   A two-and-a-half-hour interrogation of a suspect in a child pornography investigation was noncustodial where it was "conducted in an open, friendly tone" and the suspect "participated actively."   *See Bassignani,* 575 F.3d at 884. In contrast, a mere 20–30 minute interrogation in another child pornography case was custodial where it took place in a remote storage room of the suspect's house while other law enforcement officers executed a search warrant.   *See Craighead,* 539 F.3d at 1078, 1086–87. The Court finds that other circumstances than the duration of the questioning are more helpful to determining whether Weindl was in custody.

Over the course of the interview, Ewing repeatedly confronted Weindl with evidence of his guilt.   He encouraged Weindl to tell what happened to the laptop by showing him the inconsistencies in his story, and by warning that the agents would have to start questioning school parents and staff if Weindl did not help them.   While these tactics were highly persuasive, they were not unduly coercive.   Any interview of a suspect by police "will have

coercive aspects to it," but that alone does not make it a custodial situation.   *Oregon v.*
*Mathiason,* 429 U.S. 492, 495 (1977) (per curiam).

As to the degree of pressure used to detain the suspect, Weindl was not handcuffed during the interview or otherwise physically restrained.   Although Ewing and Auther never told Weindl he was free to leave, they never gave any indication he had to stay until he gave satisfactory answers to their questions.

On balance of the five factors reviewed above, the Court finds that the circumstances of the questioning of Weindl in his office do not indicate a police-dominated atmosphere, and that the interrogation was noncustodial.

Other tests of informal custody yield the same result.   In determining whether an interview of a suspect at his home was custodial, the Ninth Circuit considered "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made."   *Craighead,* 539 F.3d at 1084.   In *Craighead,* a case in which the Ninth Circuit found informal custody, eight law enforcement officers from three separate agencies came to the suspect's residence to execute a search warrant for child pornography and to interview the suspect.   *Id.* at 1078.   All were armed and wearing flak jackets; some unholstered their weapons in his presence.   *Id.*   The search was conducted by some of the officers while others interviewed the suspect.   *Id.*   Officers directed the suspect to a cluttered storage room at the back of the house for questioning.   *Id.*   The FBI special agent who conducted the questioning wore a flak jacket and a sidearm.   *Id.*   Although the FBI special agent had told the suspect he was free to terminate the interview and would not

be arrested that day, the suspect testified that he felt he was not free to leave, that he knew several officers from two other law enforcement agencies were searching his house, and that he was uncertain that they, as opposed to the FBI, would allow him to leave. *Id.* at 1079.

In Weindl's case, only two law enforcement officers were present before and during the interview; there were plenty of "police-free rooms or spaces to which the suspect may [have] retreate[d]" had he wished to terminate the interview. *Id.* at 1085. No weapons were visible, let alone drawn. Weindl was not handcuffed or otherwise physically restrained or threatened. Although the interview took place in a private office and access to the outside door was blocked, it cannot be said that Weindl was isolated. The office was centrally located within the school building. Most of all, this was Weindl's own office, where at any moment someone may have come knocking on the door looking for him or calling him on the telephone. He was not held incommunicado.

In a sworn declaration, Weindl stated that he did not consider Auther and Ewing's visit to be "friendly"; that he had to cut short a meeting with another person in order to speak with them; that the configuration of his small office and the blocking of the outside door made him "feel cornered"; that he perceived Special Agent Ewing's repeated recitations of the evidence against him, and warnings that a formal investigation would have to be launched if he did not cooperate, to be "quite threatening and frightening"; and that he had the impression he was going to be arrested if he did not answer their questions, and did not feel free to refuse. (*See* First Decl. ¶¶ 13–21.)

In weighing the credibility of Weindl's two sworn declarations, the Court takes into account that because Weindl did not testify at the hearing, his statements have not been "test[ed]

in the crucible of cross-examination." *Crawford v. Washington,* 541 U.S. 36, 61 (2004).[6]  Yet even if Weindl's description of his subjective state of mind were to be fully credited, it does not establish that a reasonable person in his situation would not have felt free to terminate the interview.  It is not enough that Weindl knew that Ewing and Auther suspected him of accessing child pornography.  The objective circumstances of the questioning must be so oppressive as to establish that the restraint of the suspect's freedom of movement was "of the degree associated with formal arrest."  *See Stansbury v. California,* 511 U.S. 318, 322 (1994).  In *Craigshead,* the interview took place in the midst of an armed raid on the suspect's home.  Weindl, in contrast, was not aware that other officers were present at the school until after the interview ended and he came out of the office.  Moreoever, he was not even informed of the existence of a search warrant until after the interview.  The totality of the circumstances of the interview do not amount to informal custody.

### 2.   Whether Weindl's Waiver of Rights Was Effective

The only remaining question is whether Weindl effectively waived his *Miranda* rights after he was taken into custody following the interview.  Ewing testified that he handed Weindl a standard FBI advice of rights form to read and sign at the picnic tables.  He said he told Weindl that he was not going to read the rights aloud to him unless Weindl needed him to, so as not to call public attention to the fact that Weindl was being arrested.  He testified that after Weindl had a chance to read the form, he asked Weindl if he understood it, and Weindl said he did.  Weindl signed the form at the bottom, as witnessed by Ewing and another agent.  (*See* Ex. 3.)  He did not place his initials next to any of the six listed rights.  Weindl maintains that he

---

[6] A defendant's testimony on a motion to suppress, in order to vindicate his rights under the Fourth Amendment, does not waive his Fifth Amendment right to remain silent  and cannot be used against him at trial to establish his guilt.  *See Simmons v. United States,* 390 U.S. 377, 390 (1968).  However, it may be used to impeach him at trial if he testifies on his own behalf.  *See United States v. Beltran-Gutierrez,* 19 F.3d 1287, 1289 (9th Cir. 1994).

was "told to sign a piece of paper" but "I did not read it carefully because I was upset." (First Decl. ¶ 21.)

On the one hand, it is clear both from his chosen profession and by his written declarations that Weindl is a well-educated person who has no difficulty reading and understanding English.  Although no doubt Weindl was upset at this point, he does not deny that he read the form, only that he read it "carefully."

On the other hand, it is troubling that the agents did not read Weindl his rights out loud or get explicit confirmation that he understood each of the six rights listed on the form.  If the agents wanted to protect Weindl's privacy, they could have taken him back into his office and gone over his rights carefully with him there.  Between the office interview and the formal arrest, not once did an agent tell Weindl that he had the right to remain silent, that any incriminating statements he made would be used against him, that he had a right to consult with a lawyer and have a lawyer present during questioning, and a right to stop answering questions at any time.

Although there is no precise form in which the *Miranda* rights need be given, it must be sufficient to ensure that the defendant is "informed in clear and unequivocal terms" of his constitutional rights.  *Miranda,* 384 U.S. at 467–68.  The defendant's prior awareness of his rights, because of his education or intelligence, does not shift the burden away from the government.  *See id.* at 471–72 ("[n]o amount of circumstantial evidence that the person may have been aware of this right will suffice to stand" instead of adequate warning); *see also United States v. Bland,* 908 F.2d 471, 474 n.1 (9th Cir. 1990) (rejecting government's suggestion that a defendant with prior experience with criminal justice system does not need complete advisement of rights).  This is because "whatever the background of the person

interrogated, a warning at the time of the interrogation is indispensable to overcome its pressures and to insure that the individual knows he is free to exercise the privilege at that point in time." *Miranda,* 384 U.S. at 469.

The Court finds that the Government has not met its heavy burden to show that Weindl made a knowing and intelligent waiver of his constitutional rights. Any statements made after Weindl was placed in custody, and any evidence relating to or resulting from such statements, may not be offered in the Government's case in chief.

## IV.   CONCLUSION

The information contained in the eBlaster reports sent to Auther on June 15, 2012, is not the product of a Fourth Amendment search. The information contained in the June 18 eBlaster reports is the product of a constitutionally protected search, but Weindl does not have Fourth Amendment standing to challenge the search. The federal wiretap statute does not provide for suppression of data gathered by eBlaster because the contents of wire or oral communications are not involved. For those reasons, the motion to suppress information in the eBlaster e-mails and reports is DENIED.

Because the interrogation of Weindl by FBI special agents in his office at Whispering Palms School on June 28, 2012, was noncustodial, the agents were not required to advise Weindl of his constitutional rights before questioning him. Weindl's statements in the office on that date were voluntary and are admissible. However, any statements made after he was placed in custody at the picnic tables, and the evidentiary fruits of those statements, are excluded from the Government's case in chief because Weindl was not adequately advised of his rights. Therefore, the motion to suppress statements is DENIED IN PART AND GRANTED IN PART.

The suppression motion having been denied in substantial part, there are insufficient grounds to support the motion to dismiss, and it is DENIED.

SO ORDERED this 20th day of November, 2012.

RAMONA V. MANGLONA
Chief Judge